IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

M.L., *et al.*,

    Plaintiffs,

v.                                        Civil Action No. PX 16-3236

JACK R. SMITH,
*et al.*,

    Defendants.

******

# MEMORANDUM OPINION

Pending before the court in this Individuals with Disabilities Education Improvement Act ("IDEA") case are the parties' cross-motions for summary judgment. *See* ECF Nos. 38 & 43. Plaintiffs appeal the decisions rendered in *M.L. v. Montgomery County Public* Schools, issued July 14, 2016, OAH No. MDSE-MONT-OT-16-069119 ("Decision 1"), and August 14, 2017, MSDE-MONT-OT-17-14090 ("Decision 2") by John J. Leidig, an Administrative Law Judge of the Maryland Office of Administrative Hearings. The matter has been fully briefed and the Court, having reviewed the full administrative record, now rules because no hearing is necessary. *See* Loc. R. 105.6. For the reasons below, Plaintiffs' motion for summary judgment, ECF No. 38, is DENIED and Defendants' motion for summary judgment, ECF No. 43, is GRANTED.

## I.    BACKGROUND

### a. The Individuals with Disabilities Education Improvement Act (IDEA)

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"). 20 U.S.C. § 1412(a)(1)(A). A FAPE provides to disabled children "meaningful access to the educational

process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit.' " *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *2 (D. Md. July 23, 2018) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982) (hereinafter "*Rowley*")). Although "the benefit conferred . . . must amount to more than trivial progress," IDEA "does not require that a school district provide a disabled child with the best possible education." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must prepare and implement an individualized educational plan ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (noting that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal"). The IEP addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in regular school classroom with non-disabled students. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing 20 U.S.C. § 1414(d)(1)(A)); *see also J.R. v. Smith*, No. DKC 16-1633, 2017 WL 3592453, at *1 (D. Md. Aug. 21, 2017).

Parents play a critical role in the IEP process. They are granted the opportunity to participate in not only the creation of the IEP, but are invited to the annual IEP review and any subsequent meetings to modify the IEP. *See* 20 U.S.C. §§ 1414(d)(1)(B)–1415(f); *see also M.M. ex rel DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 527 (4th Cir. 2002). Once an IEP is finalized, parents may accept or reject it. If parents reject the IEP as failing to provide a FAPE, they may pursue administrative remedies to include review of the disputed issue by an

Administrative Law Judge at a Due Process hearing. In the interim, parents may pay for services out of pocket for placement in a private school and afterward seek reimbursement from the state. *E.S.*, 2018 WL 3533548, at *2 (quoting 20 U.S.C. § 1412(a)(1)(C)(iii) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). Either party may challenge the outcome of the Due Process hearing by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

With this comprehensive remedial scheme as its backdrop, the Court turns to M.L.'s case.

### b. Factual History[1]

M.L was born in June 2005. At four years old, M.L. was diagnosed with a speech/language disability, and "her articulation skills were marked by numerous sound substitutions, omissions, and distortions that were not age appropriate." *Request for Due Process*, MCPS Ex. 58. At age six, M.L. was diagnosed with Specific Learning Disabilities in both reading and written language. MCPS Ex. 2; ML Ex. 12. The next year, MCPS found that M.L. was eligible for special education services. MCPS Exhs. 3 & 5.

M.L. attended kindergarten through third grade at Sligo Creek Elementary School and participated in its French immersion program. M.L. also began receiving special education services that same year. M.L. struggled in the French immersion program, and beginning in M.L.'s third grade year (2013-2014), her parents enrolled her at The Academy at Sligo Creek, a public school providing English-based instruction. ML Ex. 20.

---

[1] Much of the background to this case is undisputed as presented in the ALJ's Decisions. The Court gives the factual determinations of the ALJ appropriate deference. Citations to the record conform to the following format: Plaintiffs' exhibits appear as "ML Ex. __" and Defendants' "MCPS Ex. ___." Both parties relied on many of the same exhibits, however the Court will refer to each exhibit by the name used at the Due Process hearing. References to the ALJ's Decisions are cited as "Decision 1" and "Decision 2." The transcript is continuously paginated across all ten days of testimony, and cited as "Tr. Vol. __ at __."

During third grade, M.L. received special education instruction from Leslie Manzon, a MCPS special educator. M.L. also met three to four times per week with a Reading Specialist, Stacy Miller, for 30 minute intervals, and received speech and language services twice per week.

Displeased with M.L.'s progress, her parents hired Weinfeld Education Group, LLC ("WEG") as their educational consultant and advocate. *See* MCPS Ex. 9. Jennifer Engel Fisher ("Fisher"), an educational consultant at WEG, became M.L.'s primary advocate. M.L.'s parents communicated to WEG that they wished their daughter to attend The Siena School and for the state to cover the tuition. MCPS Ex. 9. The Siena School is a private school located in Maryland that specializes in language-based learning disabilities. Tr. Vol. 6 at 1313.

In the fall of 2013, M.L. was evaluated by psychologist Dr. Judith Trussell of the Kennedy Krieger Institute ("KKI") at the parents' request. This evaluation revealed that M.L. was emotionally stable with adequate self-esteem and age-appropriate anxiety levels. MCPS Ex. 6; ML Ex. 23; Decision 2 at ¶ 12. M.L. was found to be in the "average" range on all components of the Wechsler Intelligence Scale for Children IV (WISC-IV), except for perceptual reasoning in which she was found to be below average. MCPS Ex. 6; ML Ex. 23; Decision 2 at ¶ 13. Dr. Trussell diagnosed M.L. with a Specific Learning Disability (SLD) and Adjustment Disorder with anxiety. MCPS Ex. 6; ML Ex. 23. Dr. Trussell recommended, based on her testing and review of parent and teacher reports, that M.L. would do best with direct, intensive special-education instruction in reading and written expression, and advised that M.L.'s fine motor skills should be monitored going forward. MCPS Ex. 6; ML Ex. 23.

On January 15, 2014 and February 3, 2014, MCPS convened an IEP meeting to review M.L's progress. M.L.'s mother attended the IEP meeting with WEG consultant Fisher and legal counsel. MCPS Ex. 22; ML Exhs. 29 & 30. Also in attendance were the following individuals:

4

Dianna Jemmott, a speech language pathologist; Allison Baggott, Sligo Creek's school psychologist; Conner Pratt, one of M.L.'s general education teachers; Phil Lynch, Nekesha Price, and Leslie Manzon, MCPS special education teachers; Phil Lynch, MCPS special education supervisor; Stacy Miller, MCPS Reading Specialist; and Diantha Swift, Sligo Creek principal. MCPS Ex. 22. The meeting participants reviewed M.L.'s education performance, including teacher reports, therapy logs, testing scores, and work samples. They also considered anecdotal information from M.L.'s parents and teachers. *See, e.g.* MCPS Exhs. 13, 20, 22; ML Exhs. 25, 27, 28. The meeting participants discussed that M.L. was reading at a kindergarten level and showing some improvement, as well as making progress in phonics. M.L's mother also raised concern regarding M.L's behavioral and emotional needs, particularly M.L.'s low self-esteem because she could not read like her peers. Tr. Vol. 6 at 1310–1313; ML Exhs. 29 & 30.

At the conclusion of the IEP meetings, MCPS personnel prepared a draft IEP for the following school year. The draft IEP proposed 16.5 hours of special education per week consisting of 13 hours of direct special education in a general education setting and 3.5 hours of special education outside the general education setting. It also provided M.L. up to 1.5 hours per week with a speech/language pathologist, and an additional 20 hours per week of Extended School Year (ESY) services. M.L's Parents agreed generally with the IEP, but believed that M.L. should receive 10 hours of direct special education in a general education setting (a difference of -3 hours), and 6.5 hours of special education outside the general education setting (a difference of +3 hours). Decision 2 at ¶¶ 21–22; *see also* Tr. Vol. 1 at 488; ML Exhs. 29, 31.

On January 30, 2014, M.L.'s parents applied for her enrollment at the Lab School of Washington ("the Lab School"), a private day school for children with specific learning disabilities. MCPS Ex. 16. The Lab School teaches approximately 340 students, including

5

roughly 90 elementary school students. The Lab School employs an on-site speech/language pathologist, psychiatrist, psychologist, social workers, and occupational therapists. Decision 2 at ¶¶ 40–41, 43. The Lab School complements traditional reading and writing instruction with a multi-sensory and experiential approach to learning. Decision 2 at ¶ 53.

Sometime in April 2014, M.L.'s parents requested consultation with MCPS' High-Incident Assistive Technology (HIAT) to ascertain whether additional resources were available to meet M.L.'s educational needs. Following the HIAT consult, MCPS increased M.L.'s weekly special education hours outside the general education setting from 3.5 hours to 4.75. MCPS Ex. 34. MCPS then modified M.L.'s IEP to note that M.L.'s disabilities affected her reading (decoding, fluency, and comprehension), math (problem solving), written language, and speech/language (articulation). The finalized IEP recommended a number of accommodations and supplementary aids, and set new IEP goals in each category for the 2014–15 school year. MCPS Ex. 34.

MCPS presented the revised 2014–15 IEP to the parents at a June 2, 2014 meeting, and on June 7, 2014, MCPS gave the parents notice of their Procedural Safeguards and Parental Rights with respect to the IEP. MCPS Ex. 34; Decision 2 at ¶¶ 25 & 28. On June 30, 2014, the parents' counsel notified MCPS that they rejected the IEP as proposed and intended to place M.L. "at the Lab School of Washington for the 2014-15 school year and to seek public funding for that placement." Decision 2 at ¶ 31. On July 18, 2014, MCPS rejected the parents' request for publicly funded placement at the Lab School, and reiterated that MCPS could implement the June 2, 2014 IEP. MCPS Ex. 37.

In September 2014, M.L. began fourth grade at the Lab School. Decision 2 at ¶ 38. Shortly into the school year, Lab School speech and language pathologist, Ms. Eden Springer

("Springer"), performed several tests on M.L., including the Comprehensive Speech Language Assessment, Test of Word Reading Efficiency-Second Edition (TOWRE-2), Pathological Awareness Test 2 (PAT2), and the Goldman Fristoe Test of Articulation-2 (GFTA-2). *See* MCPS Exhs. 38, 39, 40, 41; ML Ex. 63. Based on this testing, Singer recommended two 40 minute speech pathology sessions per week, and "a nurturing atmosphere where [M.L.'s] linguistic weaknesses and strengths are recognized and accommodated in every subject area." Decision 2 at ¶ 49; MCPS Exhs. 42 & 43. On the parents' request, M.L. also underwent an occupational therapy evaluation between September 30 and December 10, 2014, which demonstrated that M.L. had subtle, but not pervasive, difficulties in areas of fine motor precision and dexterity. Decision 2 at ¶ 51. The Lab School presented its IEP on October 28, 2014, which identified goals and accommodations for M.L. in reading, written language, and math. MCPS Ex. 38; ML. Ex. 64. M.L.'s parents accepted that IEP. MCPS Ex. 38; ML Ex. 64.

At the end of the 2014–15 school year (fourth grade), M.L. had progressed academically, but was still far below grade level in her reading and written language skills, and below average in math. MCPS Exhs. 40 & 41; ML. Ex. 72. On May 4, 2015, the Lab School presented her parents with M.L.'s IEP for the next school year, which they accepted. MCPS Ex. 43; ML Ex. 73. This IEP provided that all of M.L.'s time would be dedicated to specialized education and related services, consisting of 32.75 hours of special education per week, twice weekly speech/language therapy, and 45 minutes of occupational therapy per week. MCPS Ex. 43; ML Exhs. 73 & 82.

MCPS also convened an IEP meeting in July 2015 for the 2015–16 school year. Decision 2 at ¶ 56; MCPS Exhs. 47 & 48; ML Ex. 84. MCPS reviewed M.L.'s new testing results and Lab School records, and identified areas affected by M.L.'s disabilities, to include reading

7

(decoding and comprehension), math (calculation and problem solving), written language, and speech/language (articulation). The IEP then recommended a number of accommodations, supplementary aids, and services, and set specific IEP goals in each category for the 2015–16 school year. *See* Decision 2 at ¶¶ 59–61; MCPS Exhs. 47 & 48. The IEP proposed 20 hours per week of special education, consisting of 17.5 hours outside the general education setting and 2.5 hours inside a general education setting. MCPS Exhs. 47 & 48. The IEP also provided twice-weekly 45 minute speech/language sessions. *Id. see also* Decision 2 at ¶ 63.

MCPS proposed implementation of M.L.'s 2015–16 IEP at the Learning Center at the Flora Singer Elementary School ("Flora Singer"). Decision 2 at ¶ 62; Tr. Vol. 2 at 562; Tr. Vol. 3 at 777–778; ML Exh. 121. MCPS operates approximately ten Learning Centers through Montgomery County to serve MCPS students who are performing significantly below grade level. Decision 2 at ¶ 64. Flora Singer Learning Center does not accommodate students with emotional or intellectual disabilities, and enrolls students who can learn in a general education setting for at least a portion of the school day. Decision 2 at ¶ 64; *see also* Tr. Vol. 9 at 1916–18. Out of the 700 students at Flora Singer, 70 are enrolled in the Learning Center and are integrated into the larger student population based on each student's individual needs. Decision 2 at ¶¶ 64–65; Tr. Vol. 9 at 1918–19. The educational staff at the Learning Center all have master's degrees and are certified in special education. Decision 2 at ¶ 68. The Learning Center also employs several reading specialists. Tr. Vol. 9 at 1927–29.

Had M.L. attended Flora Singer, she would have been placed in small classes of fourteen or fewer students for most academic subjects, and integrated into the general education setting for lunch, recess, social studies, and science. Decision 2 at ¶¶ 67 & 70; Tr. Vol. 9 at 1916–34. M.L.'s academic peers would have largely consisted of students performing at her reading level.

8

Tr. Vol. 9 at 1931–34.  M.L.'s parents rejected MCPS' proposed 2015–16 IEP and unilaterally placed M.L. at The Lab School for the 2015–16 school year.  MCPS Ex. 50.

### c. Procedural History

On March 7, 2016, M.L.'s parents filed a Due Process Complaint against MCPS, requesting reimbursement for the costs of placing M.L. at the Lab School for the 2014–15 and 2015–16 school years.  *See* MCPS Ex. 58.  On March 17, 2016, MCPS responded that the proposed placement at Flora Singer provided M.L. a FAPE.  Thereafter, Administrative Law Judge ("ALJ") John J. Leidig of the Maryland Office of Administrative Hearings held a ten day Due Process hearing, during which twelve witnesses testified and two hundred exhibits were introduced into the record.

On July 14, 2016, the ALJ denied Plaintiffs' request for reimbursement of the Lab School tuition, holding that MCPS had provided M.L. a FAPE for the 2014–15 and 2015–16 school years.  *See* Decision 1.  Pursuant to IDEA, M.L.'s parents, "C.L." and "W.L.", together with M.L. (collectively, "Plaintiffs"), appealed the ALJ's Decision to this Court on September 9, 2016.  *See* ECF No. 1.  While this case was pending, the United States Supreme Court issued its opinion in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dis. RE-1*, 137 S.Ct. 988 (2017).  This Court remanded this case to the ALJ for "further proceedings to consider what impact, if any, the decision in *Endrew F.*" had on the ALJ's July 14, 2016 decision.  ECF No. 27.  On August 14, 2017, the ALJ issued a subsequent decision in which he determined that *Endrew F.* had little, if any, impact on his prior determination, because the IEPs designed by MCPS also met the *Endrew F.* standard.  *See* Decision 2.  The parties then filed cross motions for summary

judgment in this Court. *See* ECF Nos. 38 & 43. At issue is whether M.L. must be placed at the Lab School to receive a FAPE, thus entitling the parents to tuition reimbursement since 2014.[2]

## II.  STANDARD OF REVIEW

At the Due Process hearing, an ALJ hears witnesses and considers the documentary evidence submitted by both parties. The party challenging the student's placement bears the burden of proving by a preponderance of the evidence that the public school failed to provide a FAPE. This Court conducts a "modified de novo review," of the ALJ's determination, giving "'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002); *see also T.B., Jr. by and through T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, No. 17-1877, 2018 WL 3579681, *6 (4th Cir. 2018); *Wagner v. Bd. of Educ. of Montgomery Cty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004). This Court must consider findings of fact "made in a regular manner and [with] evidentiary support" to be presumptively correct. *MM*, 303 F.3d at 530–31. Where a reviewing court does not adhere to such factual findings, the court must explain its reasons for deviating. *Id.*; *see also Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

Having accorded the ALJ's finding of fact such weight, the Court is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. The Court may, for example, "believe[ ] that the evidence considered as a whole point[s] to a different legal conclusion," despite accepting the factual findings of the officer below. *See Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, this Court must not substitute her "own notions of sound educational

---

[2] Because only the 2014–15 and 2015–16 school years were adjudicated by the ALJ, and Plaintiffs did not raise the 2016–17 and 2017–18 years in their Due Process Complaint below, the Court declines to reach those years. Plaintiffs must first exhaust their administrative remedies before seeking relief. Further, no evidence was submitted regarding MCPS' IEPs for these years by either party. *See also* Decision 2 at 25 n.2.

10

policy for those of the school authorities." *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014).

Further, "just as Plaintiffs were required to carry the burden of proof in the administrative hearing," *Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004), *aff'd*, 546 U.S. 49 (2005), they must also carry that burden in this Court, as they are the party seeking relief. *Schaffer*, 546 U.S. at 62. As a general matter, IDEA "plaintiffs 'face an uphill battle for several reasons,' not only because they must bear the burden of proof with respect to the evidence both in the administrative hearing and on appeal, but also because of the degree of deference owed to the administrative proceedings." *R.F. v. Cecil Cty. Pub. Sch.,* No. CV ADC-17-2203, 2018 WL 3079700, at *15 (D. Md. June 21, 2018) (quoting *Wagner*, 340 F. Supp. 2d at 611).

## III. ANALYSIS

State provision of specialized educational services "generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children." *Rowley*, 458 U.S. at 192; *see also Endrew F.*, 137 S.Ct. at 1001 (rejecting a standard that required "equal educational opportunities" as plainly at odds with IDEA and their holding in *Rowley*). Thus, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 137 S.Ct at 999 (citing *Rowley*, 458 U.S. at 206–07).

Plaintiffs contend that the ALJ erred in concluding that MCPS (not Lab School) provided M.L. a FAPE for several reasons. Plaintiffs argue that the ALJ's "misunderstood" IDEA's statute of limitations, made credibility determinations unsupported by the record, and ignored

11

important evidence, including the significance of increased special education services and M.L.'s performance at the Lab School. *See generally* ECF Nos. 38 & 46. The Court addresses each argument in turn.

   a. **Statute of Limitations**

Under IDEA, plaintiffs must file their Due Process complaint within two years of "the date the parents or agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C)-(D). Plaintiffs' Due Process Complaint was filed March 7, 2016. During the administrative hearings, the ALJ permitted, over MCPS' objection, evidence and testimony regarding M.L.'s academic record before March 7, 2014, but determined that this information was only useful as "background" to the parents' timely Due Process complaints. Decision 1 at 25; Decision 2 at 27. Plaintiffs now argue that although the ALJ admitted pre-March 7, 2014 evidence at their request, he erred by "completely ignor[ing]" it in his decisions, "invalidating much of that analysis." ECF Nos. 38 at 17 & 46 at 2–3.

Upon review of the Due Process hearing and decision, Plaintiffs' more precise challenge appears to be to the ALJ's treatment of pre-March 7, 2014 evidence, rather than the limitations determination itself. Indeed, the ALJ resolved the evidentiary dispute in Plaintiffs' favor, admitting evidence about M.L.'s initial years at MCPS. He then took account of M.L.'s educational history in his decision. *See, e g.* Decision 2 at 5–10, 26–27. Plaintiffs cannot now fault the ALJ for focusing the legal analysis on claims *not* barred by limitations. Accordingly, this challenge is without merit.

   b. **Witness Credibility Determinations**

Next, plaintiffs contend that the ALJ made credibility determinations which were baseless and unsupported by the record, and thus compel reversal of his decision. The Court

disagrees. An "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments," *S.A. v. Weast*, 898 F. Supp. 2d 869, 877–78 (D. Md. 2012) (citing *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 261 (4th Cir. 2008)). Further, this Court must accord such determinations "due deference" if "'regularly made.'" *E.S.*, 2018 WL 3533548, at *7 (*citing M.C.*, 2014 WL 7404576, at *11). An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P.*, 516 F.3d at 259. Thus, the ALJ's determination is granted such deference when, after a hearing in which the parents and the School Board presented evidence and argument, the officer resolves the factual disputes "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.*; *see also Doyle,* 953 F.2d at 104 (holding that a reviewing court should generally not "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility.") (internal citation omitted).

The ALJ in this case conducted a proper hearing, the determinations from which are entitled to deference. Twelve witnesses testified, five called by Plaintiffs. Decision 1 at 3; Decision 2 at 4. Over two hundred exhibits were admitted. The ALJ's lengthy decision demonstrates thorough review of the exhibits and testimony, providing detailed, rational explanations for his evaluation of witness credibility. *See generally* Decision 1 & Decision 2; *see also M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 378–79 (D. Md. 2015) (hereinafter "*Foose*"). For example, the ALJ explains that he accorded educational consultant Jennifer Fisher's testimony less weight because "she was hired by the parents as an education consultant and advocate," and unlike other witnesses, had limited contact with M.L. and "never taught the Student." Decision 1 at 35; Decision 2 at 36–37. The ALJ also reasonably found that Fisher

13

offered opinions in areas outside of her expertise and not otherwise substantiated by the record evidence. Decision 1 at 35–36; Decision 2 at 37–38. Further, the ALJ determined that Dr. Durham from the Lab School knew much about special education in a general sense, but knew comparatively little about M.L.'s needs, and appeared motivated to have "The Lab School deemed as the only appropriate placement." Decision 1 at 36–38; Decision 2 at 38–40. The ALJ noted specifically Dr. Durham had not taught or tutored M.L., and knew no specifics about M.L.'s alternate placements at MCPS. *See, e.g.* Decision 2 at 39–40; *see also* Tr. Vol. 5 at 1257–58. The parents' other witnesses were similarly limited in exposure to M.L. or in their base of knowledge. *See, e.g.* Decision 1 at 39–43, 45; Decision 2 at 40–41 (noting that Shincarick had only worked with M.L. one time).

The ALJ explained with sufficient detail that MCPS' witnesses testified consistently with the record evidence submitted. *See* Decision 2 at 41–42; *see also* MCPS Ex. 12. Despite MCPS' witnesses' limited exposure to M.L., the ALJ noted that their testimony was more credible because it was grounded in their particular experiences with M.L. *See* Decision 2 at 42, 44; *see also* Tr. Vol. 6 at 758–760, 1235. In sum, although plaintiffs protest otherwise, the ALJ did more than "blindly accept" MCPS' position; he reasonably determined that MCPS' witnesses were more credible than the testimony offered by Plaintiffs. *See generally* Decision 1 & Decision 2. Because this reasoning is supported in the record and as the result of an adequate fact-finding process, the Court will accord the ALJ's credibility findings due deference.

### c. Lab School Progress

Plaintiffs next challenge that the "ALJ completely ignores evidence of M.L.'s educational progress at Lab" in his decision. *See* ECF No. 38 at 37. Both ALJ decisions, however, clearly considered M.L.'s improved performance at the Lab School. Plaintiffs' challenge is more aptly

14

characterized as taking issue with the weight he accorded M.L.'s Lab School performance as a measure of providing her a FAPE. *See* Decision 2 at 49–50.

Whether a challenged IEP provided a FAPE is based on the information available to the public school *at the time* the IEP was formulated. *See Foose*, 165 F. Supp. 3d at 380; *see also J.R.*, 2017 WL 3592453, at *7–8. Further, IDEA does not require that MCPS demonstrate it can outperform or even equal the Lab School's curriculum; the Act "was never meant to guarantee children the best education money can buy; it was meant to provide children with a FAPE." *See Foose*, 165 F. Supp. 3d at 382.

In this regard, the ALJ was at liberty to accord M.L.'s Lab School performance the import that he determined appropriate. Simply because M.L. performed well at the Lab School does not automatically grant it outsized evidentiary significance. For an ALJ to find otherwise would "create a perverse incentive fundamentally at odds with the Supreme Court's definition of a FAPE" as a "basic floor of opportunity," and require resource-strapped public schools to compete with "elite private programs with top-notch services." *Id.* at 381–82; *see also E.S.*, 2018 WL 3533548, at *15 ("[T]he insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting.") (quoting *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 488 (D. Md. 2002)). The ALJ's determination to weigh M.L.'s Lab School performance as useful but not dispositive will remain undisturbed.

### d. Increase in Special Education Service Hours

Plaintiffs also argue that the "significant increase" in M.L.'s dedicated special education hours from the 2014–15 IEP to the 2015–16 IEP shows the ALJ had "no basis for finding the 2014–15 IEP appropriate." *See* ECF No. 38 at 53–54. Plaintiffs further contend that the ALJ

15

was dismissive of the "importance of this increase" and "ignored" the issue. ECF No. 38 at 53. In Plaintiffs' opinion, "[t]he only reasonable explanation [of the increase] is that MCPS saw how M.L. responded to the programming at Lab . . . and updated her IEP accordingly." ECF No. 38 at 53. Thus, Plaintiffs submit that reimbursement for M.L.'s 2014–15 tuition is required by IDEA.

The record reflects that the ALJ did not "ignore" M.L.'s uptick in special education hours. Rather, he expressly addressed and rejected this argument as meritless. *See* Decision 1 at 49–50; Decision 2 at 53–54. The ALJ found that the 2014–15 IEP adequately addressed M.L.'s documented needs as understood *at that time*. *See, e.g.* Decision 2 at 47 & 54. The ALJ next reasoned that MCPS' decision to increase special education hours was well-supported by a combination of "cogent and responsive" factors. Decision 2 at 53–54. Particularly, the ALJ highlighted credible testimony that the 2015–16 IEP was designed to give M.L. "the right amount of support, most importantly giving her reduced class sizes" and teachers "who would be well-equipped to meet her needs." Decision 2 at 50.

Importantly, the ALJ did not find it appropriate to *punish* MCPS for adapting M.L.'s IEPs to account for new testing and the Parents' requests. "[I]f services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information." *Id.* at 477; *see also T.S. v. Weast*, No. DKC-09-1581, 2010 WL 2431021, at *12 (D. Md. June 10, 2010) (citing *Schaffer* and holding that "the 2008–2009 IEP cannot be used to discredit the earlier IEP that the team had formulated by August 2007."). A student's "profile [does] not remain static over time," and a school district must be permitted to adapt a student's IEP based on "new assessments" and the student's "changing needs." *Schaffer*, 554 F.3d at 477–78.

16

The Court agrees with the ALJ's determination, and finds it well-supported by the law. The preponderance of the evidence demonstrates, as the ALJ found, that MCPS appropriately accounted for the Lab School's testing results, the parents' concerns, and M.L.'s progress during the 2014–15 school year. *See* Tr. Vol. 6 at 1815–16. Plaintiffs' argument is without merit.

### e. MCPS 2014–15 and 2015–16 IEPs Provided M.L. a FAPE

The Court next turns to whether Plaintiffs have carried their burden and shown, by a preponderance of the evidence, that the 2014–15 and 2015–16 MCPS IEPs denied M.L. a FAPE. IDEA does not "require a school district to provide a disabled child with the best possible education," so long as an IEP gives " 'the basic floor of opportunity that access to special education" provides. *See Rowley*, 458 U.S. at 192, 201. IDEA does "not mandate 'equality' or any requirement that schools provide the same education to students with disabilities as that provided to students without disabilities;" instead, "a school is required only to provide 'equal access.' " *M.L. by Leiman v. Smith*, 857 F.3d 487, 495 (4th Cir. 2017) (quoting *Rowley*, 458 U.S. at 198, 200) (emphasis omitted). Relevant here, IDEA strongly disfavors removing a disabled child completely from the general education setting. *See Endrew F.*, 137 S.Ct. at 999 ("IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible.' ") (citing *Rowley*, 48 U.S. at 202); *see also* 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.440. In assessing the propriety of an IEP, "the courts should endeavor to rely upon objective factors, such as actual educational progress." *S.A.*, 898 F.Supp.2d at 879 (quoting *MM*, 303 F.3d at 532).

Here, Plaintiffs argue that similar to the student in *Endrew F.*, M.L.'s progress was "minimal at best" and her IEPs "largely carried over the same basic goals and objectives from year to the next." *See* ECF No. 46 at 4–8 (quoting *Endrew F.*, 137 S.Ct. at 996). Plaintiffs also

17

assert that the proposed IEPs ignored "M.L.'s dramatic social/emotional decline at Sligo Creek," and that only a full-time special education would provide M.L. a FAPE. *See* ECF No. 46 at 6–7; ML Ex. 36; Tr. Vol. 6 at 1262–63. Once again, the Court does not agree with Plaintiffs.

As the ALJ noted, MCPS records demonstrate that M.L. was making meaningful progress toward her IEP goals in the public school setting. MCPS Exhs. 18, 20, 27, 31, 33; *accord S.A.*, 898 F.Supp.2d at 879. For example, at the start of third grade, M.L. could only identify four words on the MCPS Kindergarten list. *See* MCPS Exhs. 18 & 31. But by January, M.L. could correctly read and identify 24 out of 25 words, and had mastered an additional 12 words on the next list. *See* MCPS Exhs. 18 & 31. Further, M.L.'s end-of-year report card of that same year does not show, as Plaintiffs argue, "a lack of progress across all areas." ECF No. 46 at 5–6. Rather, it reflects improvement in most academic areas, including the target areas of reading comprehension, mathematics, and written language. MCPS Exhs. 33 & 35; ML Ex. 56. Other records also document that M.L. made uneven but steady progress toward her IEP goals.[3] *See, e.g.* ML Exhs. 28, 36, 42, 54, 55.

Further, this case can be distinguished from *Endrew F.* because MCPS continually adapted M.L.'s IEPs to account for new testing and performance measures, as well as the Parents' concerns about M.L.'s academic and emotional needs.[4] *See Endrew F.*, 137 S.Ct. at 996–97. MCPS significantly increased M.L.'s special education services outside the general education setting in the 2014–15 and 2015–16 IEPs, and provided for Extended School Year

---

[3] Notably, M.L. continued to make uneven progress toward her IEP goals at the Lab School. *See* ML Exhs. 82, 84. Blaming MCPS for M.L.'s poor performance in certain areas and "backsliding" on some of her IEP goals is an oversimplification of the complex problems inherent in special education, and is unsupported by the record.

[4] The Court agrees with the ALJ's determination that MCPS' IEPs for M.L. complies with the standards articulated in *Endrew F*. *Endrew F.*'s holding clarified that IDEA demands "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and requires goals of more than "*de minimis*" progress. *See* 137 S.Ct. at 1001. M.L.'s MCPS IEPs comply with *Endrew F.*, in that they were clearly designed to " 'enable [M.L] to be involved in and make progress in the general education curriculum ' " and provided "specialized instruction and services . . . with an eye toward 'progress in the general education curriculum.' " *Id.* at 999–1000 (quoting 20 U.S.C. § 1414(d)(1)(A)).

(ESY) and speech/language services, so as to help M.L. make meaningful progress toward her IEP goals. *See* MCPS 34; *see also* Tr. Vol. 6 at 1816–18, 1913–18; *compare Endrew F.*, 137 S.Ct. at 996–97. That MCPS modified M.L.'s IEP with additional services demonstrates that each IEP was "reasonably calculated" to ensure that M.L. received more than *de minimis* "educational benefits," and adequately addressed "the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S.Ct. at 1001; *see also Rowley*, 458 U.S. at 203 (holding that a school "satisfies [the FAPE] requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.").

In sum, the preponderance of the evidence affirms the ALJ's judgment, and does not support Plaintiffs' position that a full-time special education was necessary for M.L. "to make progress in light of [her] circumstances" and account for her emotional needs. *See Endrew F.*, 137 S.Ct. at 1001. The Court is sympathetic to Plaintiffs' frustrations, and mindful that as M.L.'s parents, they have strongly-held opinions about the *best* placement for M.L. However, the "IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents." *Foose*, 165 F. Supp. 3d at 385 (quoting *Lenn v. Portland Sch. Comm.*, 988, F.2d 1083, 1086 (1st Cir. 1993)); *see also M.M.*, 303 F.3d at 526. The Act rather emphasizes the provision of an appropriate education, and an adequate — not perfect — IEP. *See Foose*, 165 F. Supp. 3d at 385. MCPS' proposed IEPs were reasonably tailored to M.L.'s unique needs, and provided adequate, individualized special education services while simultaneously offering M.L. an opportunity to learn and play with non-disabled students. *See* MCPS Exhs. 34, 47, 48; *Endrew F.*, 137 S.Ct at 999–1000 (noting that "for most children, a FAPE will involve integration in the regular classroom and individualized special education" and that IDEA "prefers" that children are "fully integrated in the regular classroom"); *see also Tice*

19

*by and through Tice v. Botetourt Cty. Sch. Bd.*, 908 F.3d 1200, 1207 (4th Cir. 1990).

Accordingly, Plaintiffs' motion for summary judgment is DENIED, and MCPS' motion must be GRANTED.

IV. **CONCLUSION**

After careful review of the record, and according appropriate deference to the ALJ's findings of fact, the Court concludes that MCPS provided M.L. with a FAPE. Summary judgment is GRANTED to Defendants and DENIED to Plaintiffs. A separate Order follows.

| | |
|---|---|
| 8/7/2018 | /s/ |
| Date | Paula Xinis |
| | United States District Judge |